UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DENA PIPKIN, personally and as Personal Representative of the ESTATE OF JOSHUA HIGHTOWER; RICHARD HIGHTOWER,<br><br>Plaintiffs,<br><br>v.<br><br>THE BURLINGTON NORTHERN AND SANTA FE RAILROAD COMPANY, a foreign corporation; CREW SHUTTLE SERVICE, INC., a foreign corporation,<br><br>Defendants. | Case No. C04-5591RJB<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Crew Shuttle Services, Inc.'s Motion for Summary Judgment. Dkt. 58. The Court has reviewed all documents filed in support of and in opposition to this motion, has reviewed the entire file, and is fully advised.

I.     **BASIC and PROCEDURAL FACTS**

According to the First Amended Complaint ("Complaint"), on September 4, 2003, eight year old Joshua Hightower died while playing with a friend at the Rocky Point Rail Yard. Dkt. 27, at 2-3. Rocky Point is owned and maintained by Defendant Burlington Northern and Santa Fe Railroad Company ("Burlington"). *Id.* Joshua was found by his friend's mother, Angela Moore, after her son ran to her for help, telling her Joshua had been hit by a train. Dkt. 48-2, at 1.

ORDER - 1

Crew Shuttle Services, Inc. ("Crew") is an independent subcontractor working in and around the Rocky Point Rail Yard. Crew came to work on there as follows: Burlington hired Outsource Administrators, Inc. to assist it in finding a transport service provider. Dkt. 83-2, at 7. Outsource Administrators, in turn, contracted with Crew to provide transport services for Burlington. Dkt. 58-14. In any event, Crew's driver related that he was driving north on Pacific Avenue which borders the Rocky Point Rail Yard. Dkt. 58-3, at 3. He was traveling around 35-40 miles-per-hour. *Id.* As he reached the intersection of Barnes Street, he could see a "double stack" freight train (later identified as a Union Pacific train) passing through the Cowlitz Gardens crossing around a quarter to a half mile ahead, coming south. *Id.* at 4. He could not see the engines of the train because they were already hidden behind a work train parked between Pacific Avenue and the south bound train. *Id.* After passing the Barnes Street intersection, he spotted a person on the work train at mile post 96. *Id.* As he passed mile post 96, he looked at a 45 degree angle and realized that the person on the work train was young boy. *Id.* According to the Crew driver, he saw the boy jumping from one of the work train's cars. *Id.* Viewing facts most favorable to Plaintiffs, according to an accident reconstruction expert, the Crew shuttle driver had up to 45 seconds to act. Dkt. 78-5, at 13-14.

The police report indicated a that upon examination of the Union Pacific train, the officer saw a "very small dot on the left side of the hand rail, most forward on the lead train that appeared to possibly have a very small blood mark on it." Dkt. 48-2, at 2. According to Plaintiffs, Plaintiffs and Defendants do not dispute that Joshua's death was caused by being hit by a Union Pacific train. Dkt. 53. Union Pacific offers another explanation as to the cause of Joshua's death, noting tests results dated May 24, 2005, indicate the spot found on its' train to be negative for blood. *Id.* at 6.

Plaintiffs sued Burlington under an attractive nuisance theory, later adding Crew for failure to warn Joshua of the danger. Dkt. 27. Burlington removed this case to this Court based on diversity jurisdiction. Dkt. 1.

ORDER - 2

1    Crew moves for an order summarily dismissing all claims against them, arguing: 1) Crew
2    (or its employee) had no duty to act to try and help Joshua, and 2) even if Crew had a duty,
3    Crew's employee's failure to act was not the proximate cause of Joshua's death. Dkt. 58.
4    Plaintiff opposes the motion arguing: 1) Crew had a contractual duty to obtain and train its
5    employees in all of Burlington's polices, practices, and procedures regarding health and safety
6    including trespass abatement, and 2) whether Crew's employee's failure to act was the
7    proximate cause of Joshua's death is a question of disputed fact. Dkt. 79. Crew replies that 1)
8    there is no evidence to support that Crew had a contractual duty to evict or warn off trespassers
9    on Burlington's property. Dkt. 83.

## II.   DISCUSSION

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

ORDER - 3

e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### B.   NEGLIGENCE STANDARD

Under Washington law, which applies here, "[i]n order to establish actionable negligence, a plaintiff must establish: (1) the existence of a duty owed to the complaining party; (2) a breach of the duty; (3) resulting injury; and (4) that the breach was the proximate cause of the injury." *Folsom v. Burger King,* 135 Wash.2d 658, 671 (1998) (*citing Hansen v. Friend*, 118 Wash.2d 476, 479, 824 P.2d 483 (1992)).

#### 1.   Duty of Care

Since a negligence action will not lie if Crew did not owe Joshua a duty of care, the first question is whether a duty of care existed. *Folsom* at 671. "Under traditional tort law, absent affirmative conduct or a special relationship, no legal duty to come to the aid of a stranger exists." *Folsom* at 674. There are exceptions to this traditional rule. *Id.* "An exception may create an affirmative duty to protect another from harm." *Id.* at 674-675. Under Washington law, a duty of care regarding safety can arise out of a contract. *Kelley v. Howard S. Wright Construction Co.,* 90 Wn.2d 323, 333 (1978)(holding independent contractor had a duty to provide a safe work place where it agreed contractually to be responsible for "initiating, maintaining and supervising all safety precautions and programs in connection with the work"). Further, "an affirmative duty assumed by contract may create a liability to persons not party to the contract, where failure to properly perform the duty results in injury to them." *Id.* at 334.

Plaintiffs here allege that based on a contract, Crew had a duty to Joshua to follow all

ORDER - 4

Burlington's safety policies, practices and procedures, including trespass abatement. Dkt. 79, at 16. Crew's work at the Rocky Point Rail Yard came about as follows: Burlington hired Outsource Administrators, Inc. to assist it in finding a transport service provider. Dkt. 83-2, at 7. Outsource Administrators, in turn, contracted with Crew to provide transport services for Burlington. Dkt. 58-14. The contract between Crew and Outsource Administrators identifies "TRANSPORTATION PROVIDER" as Crew, "RAILROAD" as Burlington, and "ADMINISTRATOR" as Outsource Administrators. *Id*. The contract between Crew and Outsource Administrators provides, in relevant part:

> TRANSPORTATION PROVIDER agrees that all of its agents or employees will abide by all RAILROAD policies, practices, and procedures made known to TRANSPORTATION PROVIDER as of October 1, 1999 as they relate to health and safety issues while on RAILROAD property. It is agreed that any future changes to polices, practices, and procedures that result in increased expenses to the TRANSPORTATION PROVIDER will be reviewed and negotiated between the parties to ensure compliance.

*Id.*, at 6 § I. Section 23 of the contract between Crew and Outsource Administrators, Inc. provides:

> No waiver, modification or amendment of this Agreement shall be of any force or effect unless made in writing, signed by the TRANSPORTATION PROVIDER and ADMINISTRATOR and specifying in particular the nature and extent of such waiver, modification or amendment. . . . This Agreement and the Exhibits attached hereto and made a part hereof constitute the entire understanding between TRANSPORTATION PROVIDER and ADMINISTRATOR and cancel and supersede any prior negotiations, whether written or oral, with respect to the work or any part thereof.

The key to determining Crew's contractual duty of care turns on what Burlington health and safety policies, practices, and procedures Crew knew of as of October 1, 1999. The fact that Crew's contract was with Outsource is not dispositive as Crew urges. Crew would be bound by whatever safety polices it agreed to follow, whether it be it's own, Outsource's, or Burlington's.

Plaintiff argues that under the contract, Crew is bound by Burlington's general code of operating rules. Dkt. 79, at 13. Under Burlington's general code of operating rules, Burlington employees are required to "report any condition or practice that may threaten the safety of

ORDER - 5

trains, passengers, or employees." Dkt. 78-4.  Burlington interprets it's code to require an employee who sees a child trespassing on its property and jumping from train to train to "contact the dispatcher or yardmaster in that area to advise the trains and to contact a special agent or the police department to get the child removed." *Id.* at 3.  If possible, if it's a small child, an employee is to take the time to stop and remove the child from the rail yard himself. *Id.*  Additionally, employees are expected to at least yell at the child or warn him off. *Id.*

There is no evidence in the record that Crew was aware of Burlington's policies, practices and procedures regarding trespassing children as of October 1, 1999.  As a result, the record does not support the notion that Crew had a contractual duty to warn/help Joshua. Plaintiffs argue that Crew was under a duty to have a copy of Burlington's general code of operating procedures and to educate it's employees regarding that general code citing 49 C.F.R. 217.5  Dkt. 79, at 13. Under 49 C.F.R. 217.5 monetary penalties are applied to "any person . . . including . . . a railroad, . . . independent contractor providing goods or services to a railroad . . . who violates any requirement of this part." 49 C.F.R. 217 requires railroads, in relevant part, to file a copy of it's general operating code with the government, educate it's employees regarding the general operating code, and conduct periodic testing to ensure compliance with it's general operating code.  This Court can not find, nor do Plaintiffs point out, where these requirements include independent subcontractors.  Moreover, there is no evidence in the record that even if Crew had known of Burlington's code of operating procedures that Crew knew of Burlington's interpretation of the code in regard to child trespassers.

Plaintiffs argue that Burlington's general code of operating procedures follow industry standards, and therefore Crew should have known of Burlington's polices regarding child trespassers. Dkt. 79, at 14.  However, Crew's contractual duty was limited to what "was made known" to Crew as of October 1, 1999.  Dkt. 58, Ex. J, at 6 § I.  Plaintiffs offer no evidence that Crew knew of industry standards regarding child trespassers, much less whether Burlington had a policy, or practice to adhere to those industry standards.  Further, Plaintiffs' arguments that the driver who saw Joshua knew that child trespassers were dangerous, or that the driver

ORDER - 6

had evicted other trespassers in the past is unavailing because again, the contract duty is limited to Crew's knowledge of Burlington's policies, not individual employee's knowledge.

There is no evidence in the record that Crew had knowledge of Burlington's policies, practices, and procedures on October 1, 1999 regarding child trespassers as would be required to find that Crew had a contractual duty to Joshua. Consequently, any and all claims Plaintiffs have made against Crew, which are predicated on duty, should be dismissed.

### 2.    Proximate Cause

Having found that Crew did not have a duty to Joshua in this matter, the Court need not address the issues regarding proximate cause. In any event, proof of any causal relationship between Crew's failure to act and the accident is stretched beyond the breaking point.

## III.   ORDER

Therefore, it is now

**ORDERED** that Defendant Crew Shuttle Service's Motion for Summary Judgment (Dkt. 58) is **GRANTED.**

The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 8th day of September, 2005.

Robert J. Bryan
United States District Judge